IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALICIA HARRIS, as Special Administrator of the Estate of Tory Ray Wiliams, Sr., deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 25-CV-539-JFJ |
| 1. VIC REGALADO, in his official capacity as Tulsa County Sheriff, 2. TURN KEY HEALTH CLINICS, LLC, an Oklahoma limited liability corporation, and 3. MEGAN RASOR, APRN | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Before the Court are (1) Defendant Megan Rasor, APRN's ("Nurse Rasor") Motion to Dismiss (ECF No. 39), (2) Defendant Turn Key Health Clinic's ("Turn Key") Motion to Dismiss (ECF No. 29), and (3) Defendant Vic Regalado's ("Sheriff Regalado") Motion to Dismiss (ECF No. 28). Each defendant seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The parties have consented to a magistrate judge presiding over the case. ECF No. 45. For the reasons set forth below, all three motions are denied.

## I.      Allegations in Second Amended Complaint

Plaintiff Alicia Harris ("Plaintiff"), brings this action as Special Administrator of the Estate of Tory Ray Williams, Sr. ("Williams"), deceased. Plaintiff alleges the following relevant facts in the Second Amended Complaint (ECF No. 26). In December 2022 and January 2023, Williams received treatment for pneumonia and congestive heart failure, including a left heart catheterization on January 5, 2023. 2d Am. Compl. ¶¶ 8-18. On January 23, 2023, Williams was

arrested and transported to the Tulsa County Jail ("Jail"), where he received medical intake screening. *Id.* ¶¶ 19-21. Williams reported breathing problems and congestive heart failure to the intake nurse, and the nurse documented that Williams had hypertension and insulin-dependent diabetes. *Id.* ¶¶ 21-22. Williams authorized Turn Key to obtain his mental health records from Hillcrest and Walgreens, and the intake nurse scheduled Williams for a "chronic care evaluation" with Nurse Rasor on February 7, 2023, due to his diabetes and congestive heart failure. *Id.* ¶¶ 23, 25. On January 23, 2023, Nurse Rasor ordered insulin for Williams. *Id.* ¶ 26.

On January 25, 2023, a medical emergency was called for Williams. *Id.* ¶ 28. Turn Key medical staff responded to the call, and Williams informed the nurses that he felt as though he could not breathe. *Id.* ¶ 29. After taking Williams' vital signs and observing his breathing, Turn Key nurses found no signs of respiratory distress. *Id.* ¶ 30. Upon determining Williams was not in distress, the nurses instructed Williams to place a sick call if needed. *Id.* ¶ 32. On January 26, 2023, Nurse Rasor prescribed a dose of Lasix (a diuretic used to treat edema associated with congestive heart failure) along with a dose of potassium chloride, and she ordered a chest x-ray. *Id.* ¶ 36. On January 27, 2023, Williams underwent the x-ray, which showed "mild cardiomegaly with possible mild interstitial edema." *Id.* ¶ 37.

On January 29, 2023, a Turn Key nurse set an appointment for Williams to see Turn Key's Doctor of Nursing Practice ("DNP") Andrew Skousen, with the note stating that Williams' chest x-ray had not yet been reviewed and asking whether Turn Key would continue Williams on any medications, as he had received only a single dose of Lasix up to that date. *Id.* ¶ 40. In response to the nursing note, DNP Skousen ordered 90 doses of Lasix for Williams but did not evaluate or examine Williams. *Id.* ¶¶ 41-42. Williams received a second dose of Lasix on February 1, 2023. *Id.* ¶ 43.

On February 4, 2023, Williams went to the Jail's medical unit, complaining of shortness of breath and increased edema. *Id.* ¶ 44. According to the Turn Key nurse, Willims had "3+ pitting edema on his legs" (swelling that creates a dimple after pressing it); diminished breath sounds in his lung bases, with wheezing noted in the upper lungs; and a "non-productive cough." *Id.* ¶¶ 44. The nurse informed Turn Key physician Kent King, M.D. of Williams' symptoms, and Dr. King ordered 4 doses of 40 mg Lasix. *Id.* ¶ 45. Williams received a dose of Lasix that night. *Id.* ¶ 46. Williams also underwent an EKG on February 4, which showed "sinus tachycardia with occasional premature ventricular complexes" (extra heartbeats); "Incomplete Right Bundle Branch Block" (delay or blockage); "right Ventricular Hypertrophy" (increased muscle mass in response to chronic pressure overload); and "Nonspecific T wave abnormality" (deviations in the T waves). *Id.* ¶ 48. Several hours after taking the Lasix, Williams was feeling better and able to return to his pod, with the nurse informing Williams to notify staff if he had increased edema and shortness of breath in the future or no continued improvement from his medications. *Id.* ¶ 47.

On February 6, 2023, a Turn Key nurse noted that Williams had been experiencing a cough for more than two weeks. *Id.* ¶ 51. On February 7, 2023, Nurse Rasor provided chronic care evaluation as ordered at Williams' medical intake. *Id.* ¶ 52. At the exam, Nurse Rasor charted that Williams' heart had no murmurs or clicks and had a regular rhythm; his respirations were unlabored; and there were no edemas present on his extremities. *Id.* ¶ 53. Nurse Rasor scheduled Williams for a chest x-ray and EKG for February 21, 2023. *Id.* ¶ 54. On February 21, Williams underwent an EKG, which revealed a "possible left atrial enlargement." *Id.* ¶ 55. Nurse Rasor apparently reviewed the EKG the following day, but she did not take any action in response to the new EKG findings. *Id.* ¶ 60.

On February 24, 2023, a medical emergency was called when Williams was found by his cellmate lying on his bed, unresponsive, and covered in vomit. *Id.* ¶ 61. Plaintiff alleges Williams

3

was not closely monitored at the jail, with visual sight checks of Williams not being performed every hour as required by the Oklahoma Jail Standards. *Id.* ¶ 62. When a deputy arrived two minutes later and found Williams unconscious, he began doing chest compressions. *Id.* ¶¶ 63-64. A Turn Key nurse arrived a minute later and observed Williams had a "pink frothy sputum coming out of the corner of his mouth." *Id.* ¶ 65. The medical staff administered a dose of Narcan, which was ineffective. *Id.* ¶ 66. An ambulance was called a minute later, and EMSA arrived approximately nine minutes later to transport Williams to Hillcrest Hospital. *Id.* ¶ 67. Upon arrival at Hillcrest, Williams had no pulse or cardiac activity, and he was pronounced dead shortly after arrival. *Id.* ¶¶ 68-69.

Plaintiff alleges Turn Key's and the Tulsa County Sheriff's Office's ("TCSO") deliberate indifference to Williams' serious medical needs were in furtherance of and consistent with their policies, customs, and/or practices. *Id.* ¶ 71. Plaintiff alleges Tulsa County/Sheriff Regalado retained Turn Key in December 2016 as the Jail's medical contractor, pursuant to a contract that made Turn Key responsible for the costs of pharmaceuticals, off-site medical services, and hospitalizations up to $500,000 per year, with the County/TCSO responsible for any excess costs. *Id.* ¶¶ 82, 88. Plaintiff alleges these contractual provisions incentivize under-prescribing and under-administering medications and keeping inmates at the Jail to avoid off-site costs, despite inmates' serious medical needs. *Id.* ¶ 89. Plaintiff alleges Turn Key (1) has a policy of avoiding off-site medical costs for inmates at the Jail as a cost-saving measure; (2) has an established policy, practice, and/or custom of allowing undertrained and under-supervised LPNs to, *de facto*, run the medical unit at the Jail; (3) has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs; and (4) has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs and when to report alarming vital signs to a physician; and failing

to send inmates with complex and serious medical and mental health needs to an outside medical facility for adequate assessment and treatment. *Id.* ¶¶ 90-98. Plaintiff alleges Turn Key's policies and customs were a moving force behind the constitutional violations and injuries to Williams and others. *Id.* ¶ 99. Plaintiff provides details of nine other instances of Turn Key's alleged deficient medical care system leading to deaths or negative medical outcomes – four at the Jail and five at other jail facilities where Turn Key was the contractual medical provider. *Id.* ¶¶ 101-148.

Further, as to Sheriff Regalado/Tulsa County, Plaintiff alleges that by the time of Williams' incarceration in January 2023, the County/TCSO "knew, or should have known, that Turn Key's grossly deficient system and 'plan' posed excessive risks to the health and safety of inmates, like Mr. Williams, who suffer from serious and complex medical conditions." *Id.* ¶ 85. Plaintiff alleges Sheriff Regalado/Tulsa County are aware or should be aware of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates yet made the conscious decision to retain Turn Key as the Jail's medical provider. *Id.* ¶ 154. Plaintiff describes four other incidents at the Jail since 2017, in which Turn Key's allegedly deficient medical care resulted in death or negative medical consequences for inmates or detainees. *Id.* ¶¶ 105-106 (Caleb Lee), ¶¶ 107-115 (Dunniven Phelps), ¶¶ 136-142 (Dean Stith), ¶¶ 143-148 (Montoya Holmes). Plaintiff further alleges Sheriff Regalado/Tulsa County had a "well-established policy, custom, or procedure whereby visual sight checks of inmates were not performed as required by the Oklahoma Jail Standards," and the failure to conduct sight checks of Williams was consistent with that policy, custom, or practice. *Id.* ¶¶ 156-157.

Plaintiff asserts claims under 42 U.S.C. § 1983 against the Defendants for failure to provide adequate medical care in violation of Williams' Fourteenth Amendment rights, specifically (1) individual liability against Nurse Rasor for failure to provide Williams with adequate or timely medical treatment, proper monitoring and supervision, diagnostic testing, and reasonable access

to outside medical providers, in deliberate indifference to Williams' serious medical needs, health, and safety; (2) municipal liability against Turn Key for effectively denying Williams constitutional conditions of confinement resulting from gross deficiencies in medical procedures, staffing, facilities, and procedures; and (3) official capacity liability against Sheriff Regalado for maintaining a healthcare delivery system at the Tulsa County Jail that has such gross deficiencies in staffing, facilities, equipment, or procedures that Williams was effectively denied access to adequate medical care.

## II.      Motion to Dismiss – Rule 12(b)(6) Standard

In considering a Rule 12(b)(6) motion, the court must accept all well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the nonmoving party. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008). A court must then determine whether these accepted facts state a facially "plausible" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.* (internal quotations omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* at 678 (citation modified).

## III.      Nurse Rasor

Nurse Rasor seeks dismissal of the claim against her pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff's allegations regarding the EKG reports establish that Nurse Rasor was attentive to Williams' medical needs and not deliberately indifferent.  Nurse

Rasor argues the allegations show that there was no reason to believe Williams would suffer a sudden, fatal medical event on February 24, 2023.

### A.      Deliberate Indifference

Under the Fourteenth Amendment, pre-trial detainees have a constitutional right to medical care, which is violated when medical providers or prison officials are deliberately indifferent to a detainee's serious medical needs. *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985).[1] "The deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Johnson v. Sanders*, 121 F.4th 80, 88 (10th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The Tenth Circuit has equated deliberate indifference to "recklessness, in which a person disregards a risk of harm of which he is aware." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1154 (10th Cir. 2022) (quotation omitted).

The Tenth Circuit recognizes two types of conduct amounting to deliberate indifference in the context of detainee medical care. "First, a medical professional may fail to treat a serious medical condition properly." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). When this type of conduct is alleged, "the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). Second, prison officials may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). A prison medical professional who serves solely "as a gatekeeper for other medical

---

[1] Courts apply a Fourteenth Amendment due process standard that protects pretrial detainees against deliberate indifference to their serious medical needs, while the Eighth Amendment's prohibition of cruel and unusual punishment protects convicted inmates. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). The same analysis applies to both an Eighth Amendment and a Fourteenth Amendment claim when a plaintiff brings a § 1983 claim for deliberate indifference. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

personnel capable of treating the condition" may be liable under this standard if he or she "delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Id.*

Deliberate indifference "involves both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Sealock*, 218 F.3d at 1209). "[T]he focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). The question raised by the objective prong "is whether the alleged harm . . . is sufficiently serious . . . , rather than whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Mata*, 427 F.3d at 751 (quoting *Farmer*, 511 U.S. at 837). The subjective component may be met if the jury can "infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 842). Moreover, the subjective component may be satisfied if the defendant's

"delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition.  Even a brief delay may be unconstitutional."  *Mata*, 427 F.3d at 755.  However, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."  *Self*, 439 F.3d at 1233 (quotation omitted).

### B.    Analysis

Plaintiff has plausibly alleged a claim under § 1983 based on Nurse Rasor's deliberate indifference to Williams' serious medical needs.  Plaintiff alleges Williams was in custody at the Tulsa County Jail for 32 days, during which time his heart condition worsened.  Specifically, Plaintiff alleges a February 4, 2023, EKG revealed sinus tachycardia with occasional premature ventricular complexes; incomplete right bundle branch block; right ventricular hypertrophy; and nonspecific T wave abnormality.  Plaintiff alleges Turn Key medical staff, including Nurse Rasor, took no action in response to the EKG findings, with Nurse Rasor conducting only an evaluation on February 7, 2023.  On February 21, 2023, a second EKG revealed "possible left atrial enlargement," suggesting a new problem with the left side of Williams' heart.  Plaintiff alleges this deterioration should have triggered an immediate evaluation from a physician or trip to the hospital, but again, Turn Key staff and Nurse Rasor took no action.  Three days later, Williams was found unresponsive in his cell, and he died that day despite attempts to revive him.

These allegations, taken as true for purposes of this motion, state a claim for a constitutional violation.  As for the objective component, Plaintiff has plausibly alleged Williams suffered a serious medical need in the form of a deteriorating heart condition as evidenced on the EKG reports, which Nurse Rasor failed to escalate or respond with treatment.  Only three days after his second EKG, which revealed a new left heart condition, Williams died.  Death is undoubtedly sufficiently serious to meet the objective component.  *See Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009) (explaining that an inmate's heart attack and death were "without doubt,

sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment").

As for the subjective component, a reasonable inference can be drawn from Plaintiff's allegations that Nurse Rasor had actual knowledge of Williams' serious medical conditions based on her background knowledge of Williams' heart problems, in combination with her review of Williams' second EKG. Plaintiff sufficiently alleges Nurse Rasor failed in her "gatekeeper" duty to contact other medical personnel capable of treating Williams' condition. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) (explaining that "doing nothing in the face of serious medical needs is obviously sufficient to state a claim" under "gatekeeper" theory). Nurse Rasor's alleged delay or failure in addressing or escalating Williams' known deteriorating heart condition demonstrates deliberate indifference to Williams' serious medical needs. *See id.* (explaining that, "under the subjective component of the deliberate indifference analysis, a licensed medical professional's heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk; especially so when the injuries, like here, are internal and impossible for a layman to surmise") (citation omitted). Williams' symptoms, shown via the EKG readings on February 4 and 21, may plausibly indicate that Nurse Rasor "knew the risk to the prisoner and chose (recklessly) to disregard it." *Martinez*, 563 F.3d at 1089. *See Self*, 439 F.3d 1227 (explaining that subjective indifference may be shown if a medical professional "responds to an obvious risk with treatment that is patently unreasonable"). *Cf. Mata*, 427 F.3d at 759 (concluding that prison nurses fulfilled gatekeeper role by reporting EKG findings to higher-level providers).

In briefing, Nurse Rasor asks the Court to find that the EKG results on February 21 actually indicated substantial improvement in Williams' heart condition, compared to his earlier results on February 4. Nurse Rasor argues it is improper to "stack" the two EKG results as cumulative.

10

Nurse Rasor further argues that a "possible left atrial enlargement," even if present, does not indicate an emergency situation, like a heart attack, but rather indicates another underlying condition that may be chronic. Nurse Rasor likens the EKG findings to symptoms of a common cold, which a layperson without specialized medical knowledge could find not emergent and not requiring immediate hospital transport or an urgent call to a physician. She urges the Court to make these findings based on its "common sense" and definitions from Internet sources. Nurse Rasor urges the Court to take judicial notice of the meaning of "possible left atrial enlargement," according to an Internet medical source, as an abnormal increase in the left atrium size that may remain asymptomatic but may indicate underlying cardiac pathology that warrants further investigation. *See* ECF No. 39 at 5 n.3.

The Court rejects Nurse Rasor's arguments. At the motion to dismiss stage, the Court must take Plaintiff's allegations as true and must not read additional facts into the record based on Nurse Rasor's own interpretation of the EKG findings. Plaintiff alleges Williams died three days after the EKG, and the Court cannot conclude at this stage of proceedings that Nurse Rasor acted in an objectively reasonable manner in response to the EKG findings. At this stage of the proceeding, the Court also cannot decide, when such findings are considered based on "common sense" or the Internet definition provided, that the second EKG findings were similar to mere cold symptoms. This is particularly true when viewed in conjunction with the prior EKG findings and Williams' reported history of congestive heart failure and other conditions. Plaintiff alleges that Nurse Rasor was aware of all these facts, and it is at least plausible that she knew the risks to Williams and chose not to elevate care with deliberate indifference to those risks.

Finally, the Court rejects Nurse Rasor's attempt to analogize Plaintiff's claims to those in *Mejia-Perez v. Centurion of Ariz. LLC*, No. CV 22-00896-PHX-DWL (JFM), 2023 U.S. Dist. LEXIS 205624 (D. Ariz. Nov. 16, 2023). In *Mejia-Perez*, an outside physician reviewed a prison

11

inmate's EKG findings, which included "bilateral atrial enlargement." *Id.* at \*24. The outside physician recommended a non-urgent follow-up appointment. *Id.* The plaintiff in that case did not allege deliberate indifference occurred based on this recommendation, but rather based on the prison doctor's denial of an earlier EKG. *Id.* at 33-34. Therefore, Nurse Rasor's argument that "deliberate indifference was not found in this case," is misleading, as the issues on summary judgment in *Mejia-Perez* had nothing to do with that particular EKG finding or the resulting recommendation by a physician.

Nurse Rasor's motion to dismiss is denied.

## IV.    Turn Key

Plaintiff brings a § 1983 claim against Turn Key pursuant to a municipal liability theory. Section 1983 liability can lie with an entity such as Turn Key, but only when a constitutional violation is inflicted pursuant to a government policy or custom. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978). "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694-95). *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (explaining that a municipal entity "may not be held liable under § 1983 solely because it employs a tortfeasor"). *Monell* liability "has been extended to 'private entities acting under color of state law,' such as medical contractors." *Lucas*, 58 F.4th at 1144 (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003)).

### A.    Constitutional Violation

To establish a medical contractor's *Monell* liability, the plaintiff must first plausibly allege that its employee or employees violated a plaintiff's constitutional rights. *See Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1275 (10th Cir. 2022). Alternatively, even if no single individual employee is found liable, a municipal entity may still be liable for a "systemic failure

12

of medical policies and procedures" as a basis for unconstitutional conduct. *Lucas*, 58 F.4th at 1144 (citing *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191-92 (10th Cir. 2020)). Here, Plaintiff alleges both kinds of constitutional violations committed by Turn Key.

Plaintiff has adequately alleged a constitutional violation by Nurse Rasor, *see supra* Part III, who Plaintiff alleges was Turn Key's employee at the relevant times and acting within the scope of her employment. *See* 2d Am. Compl. ¶ 4.[2]

The Court does not find Plaintiff sufficiently alleges a constitutional violation based on any "systemic" failure of Turn Key's medical policies and procedures. Although Plaintiff alleges Williams was never evaluated or seen by a physician while incarcerated at the Jail (2d Am. Compl. ¶ 70), Plaintiff alleges only one failure by Nurse Rasor that may have led to his death. This singular failure, attributed to a single Turn Key employee, is insufficient to establish a systemic failure by Turn Key. *Cf. Wimbley v. McCurtain Cnty. Jail Trust*, No. CIV-25-78-RAW-GLJ, 2025 WL 3190646, at *5 (E.D. Okla. Aug. 29, 2026) (finding plaintiff adequately alleged constitutional violation based on "systemic failure" at Turn Key to adequately staff physicians at jail, where plaintiff exhibited multiple stroke symptoms but Turn Key staff refused plaintiff's repeated requests for medical help over the course of a month).

Plaintiff sufficiently pleaded a constitutional violation committed by Nurse Rasor, and the Court proceeds to the other elements of *Monell* liability in relation to that constitutional violation.

### B.      Other Elements of *Monell* Liability

In addition to proving a constitutional violation, to hold a municipality liable, a plaintiff must prove "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3)

---

[2] In its motion, Turn Key raises the same arguments Nurse Rasor raised regarding the significance and seriousness of the EKG findings on February 4 and 21. ECF No. 29 at 10-12. The Court rejects those arguments for the same reasons explained above with regard to Nurse Rasor's motion.

that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1253 (10th Cir. 2022).

For the first element of *Monell* liability, an official municipal policy or custom may take several forms, including: (1) "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," or (2) "the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation modified). These are the two types of municipal policies or customs alleged by Plaintiff in this case. The Court addresses each below.

### 1. Plaintiff Has Not Adequately Alleged Municipal Liability Based on Informal Custom

Plaintiff alleges three informal customs by Turn Key: (1) under-prescribing medication and discouraging the sending of inmates offsite for medical care, to achieve profits under the cost-saving terms of its agreement with the Tulsa County Sheriff's Office; (2) permitting undertrained and under-supervised LPNs to *de facto*, run the medical unit at the Jail, without direct supervision by a physician or RN; and (3) failing to adequately assess inmates with complex and serious medical needs, including failure to regularly take vital signs. Plaintiff fails to state a claim for any of these alleged informal customs.[3]

---

[3] Plaintiff's allegations concerning the alleged deficiencies in medical care provided at the Jail by other medical providers, such as Armor Correctional Health Services, Inc. (2d Am. Compl. ¶¶ 73-81), are not relevant to Turn Key's policies, customs, and practices. Therefore, the Court does not consider those events for purposes of deciding Turn Key's motion.

### a)      Cost-Saving Measures

Plaintiff first alleges generally that Turn Key implemented cost-saving measures of under-prescribing medication and discouraging sending inmates to offsite care, pursuant to its cost-sharing contract with Tulsa County.  This theory fails for three reasons.  First, the cost-sharing agreement itself is not sufficient to establish a custom of improper cost-cutting, because it does not "reveal an *improper* financial incentive to keep costs low as it simply describes the cost sharing agreement between the County and Turn Key." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023) (emphasis added) (analyzing similar or identical contract to that alleged in this case and explaining that, to the extent the contract reveals any financial incentive, "it is no more troublesome than any institution's general desire to maintain low costs"); *Robinson*, 2026 WL 788150, at *8 (explaining that, to withstand a motion to dismiss, plaintiff's municipal claim against Turn Key must rest on more than the "bald claim that Turn Key's policies were driven by cost-cutting measures").

Second, assuming this policy of cost-cutting was adequately pled and supported by the cost-sharing agreement, Plaintiff's Second Amended Complaint does not allege that Nurse Rasor, as the employee committing the constitutional violation, was motivated by reducing costs in her failure to escalate Plaintiff's care to a physician or an emergency facility.  Instead, as explained below, the facts alleged in the Second Amended Complaint indicate that Nurse Rasor knowingly disregarded risks revealed by the EKG findings because she did not receive adequate training on when to escalate care in the face of serious medical risks. *See Lucas*, 58 F.4th at 1145 (holding that complaint did not sufficiently allege that medical staff were "motivated by cost" in their actions or plead facts leading to a plausible inference that any cost-saving policies caused the plaintiff's injuries).

Third, to the extent Plaintiff relies on an alleged "systemic" failure at Turn Key that connects to Turn Key's cost-cutting measures, Plaintiff has not adequately alleged a constitutional violation based on any such "systemic" failure. Plaintiff's allegations based on this theory are disconnected from the factual allegations regarding Williams' medical care at the Jail. Plaintiff identifies a single nurse and a specific failure of care, which do not plausibly amount to a "systemic" failure by Turn Key. Consequently, Plaintiff does not adequately connect the factual allegations to any cost-saving policy by Turn Key. *Cf. Wimbley*, 2025 WL 3190646, at *5 (finding plaintiff sufficiently alleged a connection between Turn Key's lack of funding for physicians to his alleged injuries, where plaintiff repeatedly requested medical assistance for stroke symptoms but Turn Key staff refused to send him to the hospital or have him assessed by a physician).

### b) LPNs and Inadequate Assessment

The second and third alleged customs are not adequately tied to the facts of this case or Williams' injuries. Plaintiff does not allege that Williams' care was supervised by any "undertrained and under-supervised LPN." To the contrary, Plaintiff alleges Nurse Rasor, who is an APRN, provided the constitutionally deficient care to Williams. Plaintiff also does not allege Williams' vitals were not regularly taken or that he was inadequately "assessed" in any specific way. Rather, Plaintiff's allegations of constitutionally deficient care pertain to Nurse Rasor's failure to act on Williams' concerning EKG findings, which the Court views as different in nature than mere "assessment" of Williams' condition. These two alleged customs cannot plausibly have caused Williams' injuries.

### 2. Plaintiff Has Adequately Alleged Municipal Liability Based on Failure to Train

Plaintiff alleges one "failure to train" theory of municipal liability: that Turn Key had an established practice of failing to train medical staff on what constitutes alarming vital signs and

16

when to report alarming vital signs to a physician, and failing to send inmates with complex and serious medical needs for outside treatment.

Entity liability "is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). Under this theory, a plaintiff must demonstrate that the "need for more or different training was so obvious, and the inadequacy so likely to result" in the constitutional violation, that the municipal policymakers "can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (citation modified). It is insufficient to show there were "general deficiencies" in the training program. *Id.* (quotation omitted). Rather, the plaintiff must "identify a specific deficiency that was obvious and closely related to his injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury." *Id.* (quotation omitted).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quotation omitted).[4] A municipality's "continued adherence to an approach that [it] know[s] or should know has failed to prevent tortious conduct by employees may establish the

---

[4] In a narrow range of circumstances, a failure to train theory of municipal liability may be based on a single incident, where a violation of federal rights may be a "highly predictable consequence" of the specific training failure. *Valdez*, 66 F.4th at 815 (quotation omitted). Such a theory, while rarely applicable, would not require proof of a pre-existing pattern of violations. *Id.* at 816. Because Plaintiff does not appear to rely on this theory of "single-incident" liability, the Court does not address it in-depth.

17

conscious disregard for the consequences of [its] action – the 'deliberate indifference' – necessary to trigger municipal liability." *Id.* (quotation omitted).  Without such notice of a particular training deficiency, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*[5]

In addition to establishing a training deficiency and deliberate indifference to such deficiency, a plaintiff must plead that there is a "direct causal link between the policy or custom and the injury alleged." *Id.* (quotation omitted).  *See Haines v. Fisher*, 82 F.3d 1503, 1507 (10th Cir. 1996) (explaining that the municipality's official policy must be the "moving force for the constitutional violation in order to establish the liability of a government body under § 1983") (citing *Monell*, 436 U.S. at 694).  "Therefore, it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *Hollingsworth v. Hill*, 110 F.3d 733, 744 (10th Cir. 1997) (citation modified).

The Court finds that Plaintiff's alleged training deficiency in the form of failing to train medical staff on when to report alarming vital signs to a physician, and failing to send inmates with serious medical needs to an outside facility, is specifically and adequately pled.  *See Est. of Angelo v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, No. 1:23-CV-01607-CNS-STV, 2024 WL 2274080, at *14 (D. Colo. May 20, 2024) (finding allegations that jail medical provider trained its staff "not to escalate care" is a "specific deficiency" for municipal liability purposes on a motion to dismiss).  This alleged practice of failure to train directly links to Turn Key's alleged deliberate indifference to Williams' medical needs via its employee Nurse Rasor, who allegedly was not

---

[5] Due to the overlap in the failure-to-train context, the Court evaluates the "policy or custom" and "deliberate indifference" elements of *Monell* liability together.

18

properly trained to elevate Williams' concerning EKG findings on February 21, 2023, by contacting a physician or having him taken to a hospital.[6]

Plaintiff also adequately alleges a pattern or practice of similar constitutional violations by allegedly untrained Turn Key employees. Plaintiff cites eight other prior instances of allegedly constitutionally inadequate care by Turn Key personnel at the Jail and other jail facilities involving Turn Key personnel. *Id.* ¶¶ 105-142.[7] Many of those instances involved inmates with serious symptoms and vital signs, where Turn Key staff failed to report the symptoms to a physician or transport the inmate to the hospital, which resulted in negative medical outcomes for the inmate, including death. Most similar to Williams' situation, Plaintiff alleges Dunnivan Phelps was booked into the Jail in September 2019 and, despite symptoms of severe weakness on one side of his body and a finding by a Turn Key nurse of high blood pressure, the Turn Key nurse did not escalate Phelps' case by reporting it to a physician, RN, or Nurse Practitioner. 2d Am. Compl. ¶¶ 107-111. Not until later the following day did an APRN determine that Phelps had a three-day history of stroke symptoms. *Id.* ¶ 115. As another similar example, Plaintiff alleges Dean Stith was booked into the Jail in December 2021, and a Turn Key psychologist failed to call for an ambulance or escalate Stith's care to a physician despite concerning fluctuations of his vital signs. *Id.* at ¶¶136-140. The following day, Stith was found unresponsive in his cell and was transported to the hospital in cardiac arrest, dying shortly after arrival. *Id.* ¶ 142. These allegations support an inference that Turn Key's established practice of maintaining an inadequately trained medical staff on elevation of care, exhibited by its past conduct, resulted in Turn Key's alleged deliberate

---

[6] The Court reads the term "vital signs" broadly to include EKG findings.

[7] The August 2023 incident at the Jail involving Montoya Holmes occurred after Williams' death and therefore cannot form the basis for notice of a pre-existing pattern of deficient training. 2d Am. Compl. ¶¶ 143-148.

indifference to Williams' obvious need for medical care.  There is no set numerical requirement, and the Court finds the number alleged here to be sufficient.  *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015) (explaining that, to establish the existence of an informal policy, custom, or practice, a plaintiff may plead "a pattern of multiple similar instances of misconduct," with "no set number" required to "render the alleged policy plausible").

Turn Key argues that the Court should not find a "custom" of failing to train or deliberate indifference to such inadequate training, because many of the prior instances alleged in the Second Amended Complaint either remain active cases, resulted in settlement, or resulted in a finding of no liability for Turn Key.  Turn Key essentially argues that, if a plaintiff alleges multiple instances of constitutional violations, but Turn Key prolonged or settled the underlying prior legal cases, Turn Key should prevail on a motion to dismiss a *Monell* claim.  The Court is unpersuaded, at least at this stage of the proceedings, that pending or settled cases should be excluded from the analysis of whether it had a custom of failing to train and was acting with deliberate indifference to such inadequate training.  Based on the Court's review of judicial records, none of the three prior cases from the Jail held that there was no underlying constitutional violation by the relevant Turn Key employee.[8]  Further, the incidents are identical to the type of § 1983 allegations in this case, and they fall within six years of Williams' incident in this case, meaning the prior incidents have a clear nexus to Plaintiff's allegations.  *Cf. Lopez v. City of Opa-Locka*, No. 24-22076-CIV-ALTONAGA/Reid, 2024 WL 4930610, at *3-4 (S.D. Fla. Dec. 2, 2024) (finding spreadsheet of 11 prior § 1983 cases against city unpersuasive to establish a policy or custom of relevant

---

[8] The Court views this as a critical factor.  If any court had held that there was no underlying constitutional violation by any Turn Key employee, this argument by Turn Key may be more persuasive.

constitutional violations, where cases varied widely in types of § 1983 claims and spanned over two decades).

Finally, Plaintiff has adequately pleaded causation, because it is plausible that Turn Key's alleged widespread training deficiencies resulted in Williams' death. Nurse Rasor's alleged failure to escalate Williams' care following her review of the February 21 EKG was "consistent with the chronic deficiencies" in medical care that amounted to a widespread policy of a failure to train Turn Key staff on when to escalate alarming vital signs. *Burke v. Regalado*, 935 F.3d 960, 1000 (10th Cir. 2019). The "execution" of the custom – waiting to act on the EKG findings instead of notifying a physician or taking Williams to the hospital – "inflicted" Williams' injury by causing his condition to worsen until he was found unresponsive in his cell on February 24. *See Hollingsworth*, 110 F.3d at 744.

Plaintiff sufficiently pleaded *Monell* liability for Nurse Rasor's alleged constitutional violation based on a failure-to-train theory. Turn Key's motion to dismiss is denied.

## V.   Sheriff Regalado

### A.   Consideration of Material Beyond Complaint

As an initial matter, Sheriff Regalado requests that the Court look beyond the Second Amended Complaint and consider Williams' complete medical record while at the Jail, attaching the record as an exhibit to his motion. ECF No. 28-1 (medical record). Sheriff Regalado explains that Plaintiff directly quotes from and references Williams' Jail medical record throughout the Second Amended Complaint. Sheriff Regalado argues that, as a document referenced in the complaint and central to Plaintiff's claims, Williams' full Jail medical record, the authenticity of which is not in dispute, should be considered as part of the motion to dismiss. Plaintiff opposes the request.

21

In general, "a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation omitted).  However, the court may consider documents referred to in the complaint on a motion to dismiss "if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quotation omitted).  "Those documents, however, 'may only be considered to show their contents, not to prove the truth of matters asserted therein.'" *Walbridge v. City of Oilton, Oklahoma*, 785 F. Supp. 3d 978, 989 (N.D. Okla. 2025) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)).

Here, the Court rejects Sheriff Regalado's request for consideration of Williams' full Jail medical record and excludes it from the Rule 12(b)(6) analysis.  In her response brief, Plaintiff disputes whether the record submitted by Sheriff Regalado is "complete, accurate, or even authentic."  ECF No. 36 at 15.  Thus, Plaintiff directly disputes the accuracy and completeness of the medical record.  Further, medical records are not the type of documents that are typically considered at the motion-to-dismiss stage, because they are prone to disputes as to meaning and accuracy.  *See Crawford v. Turn Key Health Clinics, LLC*, No. 24-CV-6-JDR-SH, 2025 WL 1885637, at *3 (N.D. Okla. July 8, 2025) ("Medical records are not akin to a contract or insurance policy where there is no dispute as to the authenticity or accuracy of the document."); *Morris v. City of Tulsa*, No. 19-cv-0073-CVE-JFJ, 2019 WL 7373035, at *3 (N.D. Okla. Dec. 31, 2019).  Therefore, the Court declines to consider the submitted medical record evidence in ruling on Sheriff Regalado's motion to dismiss.

### B.    Municipal Liability

As with Turn Key, Plaintiff asserts a *Monell* claim against Sheriff Regalado in his official capacity as Sheriff of Tulsa County.  This claim is effectively a claim against Tulsa County.  *See*

22

*Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019).  Therefore, Plaintiff must allege facts showing that a policy or custom by Sheriff Regalado or TCSO, or deliberately indifferent training or supervision, caused Williams' constitutional deprivation.  *See id.* at 998-99 (10th Cir. 2019).

Sheriff Regalado first argues that Plaintiff fails to plead a constitutional deprivation. However, as discussed above with respect to Nurse Rasor, Plaintiff states a § 1983 claim against Nurse Rasor for deliberate indifference to Williams' serious medical needs in violation of Williams' rights under the Fourteenth Amendment.  The Court rejects Sheriff Regalado's arguments that no such deprivation occurred for reasons explained above with respect to Nurse Rasor's motion.  Plaintiff has alleged sufficient facts to show that Williams suffered a constitutional deprivation at the Jail by an employee of TCSO's contractual medical provider.

Sheriff Regalado next argues Plaintiff fails to show a custom or policy maintained by Sheriff Regalado or TCSO that was the moving force behind deprivation of Williams' constitutional rights.  Courts in this district have found that a sheriff is the final policymaker for a county jail who is responsible for enforcing the jail's policies and procedures for providing adequate medical care to inmates.  *See Robinson v. Turn Key Health Clinics, LLC*, No. 24-CV-0622-CVE-MTS, 2026 WL 788150, at *8 (N.D. Okla. Mar. 20, 2026); *Crawford v. Turn Key Health Clinics, LLC*, No. 24-CV-6-JDR-SH, 2025 WL 1885637, at *7-8 (N.D. Okla. July 8, 2025); *Wirtz v. Regalado*, No. 18-CV-599-GKF-FHM, 2020 WL 1016445, at *13 (N.D. Okla. Mar. 2, 2020).  Therefore, to state an official-capacity claim against Sheriff Regalado, Plaintiff "must allege facts to plausibly suggest that the constitutional violation, carried out by Turn Key employees, represented an official policy or custom of Tulsa County or TCSO, establishing 'a

23

causal link between the municipal action and the deprivation of federal rights.'" *Robinson*, 2026 WL 788150, at *8 (quoting *Brown*, 520 U.S. at 404).[9]

Plaintiff's allegations satisfy this standard. Plaintiff alleges that Sheriff Regalado retained Turn Key as the Jail's medical provider despite Turn Key's constitutionally deficient medical care at the Jail, as demonstrated through Turn Key's established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and when to send inmates with complex and serious medical and mental health needs to an outside medical facility for adequate assessment and treatment. ECF No. 36 at 21-22 (citing 2d Am. Compl. ¶ 98). Plaintiff alleges this policy of retaining Turn Key, despite its deficient medical care, was the direct cause of the violation of Williams' constitutional rights. Specifically, the failure to train Turn Key staff, including Nurse Rasor, on when to escalate care for concerning vital signs resulted in the failure of Nurse Rasor to escalate Williams' concerning EKG results to a physician or take Williams to the hospital, ultimately leading to Williams' death. 2d Am. Compl. ¶¶ 99, 154-155.

Plaintiff further alleges that Turn Key's established practice of deficient training was widespread. Based on these prior incidents, Sheriff Regalado was or should have been aware that

---

[9] The Court acknowledges Plaintiff's argument that a public entity such as TCSO may be liable under § 1983 pursuant to a doctrine of "non-delegable duty." Under this doctrine, which has been adopted by some district courts within the Tenth Circuit, "a public entity may be indirectly liable under § 1983 for a third party's policies when it contracts out its final policymaking authority to a third party." *Est. of Angelo*, 2024 WL 2274080, at *19. The question then "is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by [Turn Key]'s policy, but whether [Turn Key] had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable because [Turn Key] stepped into the County's shoes with the County's permission." *Est. of Walter by & through Klodnicki v. Corr. Healthcare Companies, Inc.*, 323 F. Supp. 3d 1199, 1216 (D. Colo. 2018). *See also Stewart v. Dominicis*, No. 24-3058-JWB, 2026 WL 1345859, at *6 (D. Kan. May 14, 2026). The Tenth Circuit and Oklahoma district courts have not clearly adopted this approach, and the Court does not rely on it here.

Turn Key was providing constitutionally inadequate medical care to inmates and yet retained Turn Key as the Jail's medical provider. *Id.* ¶¶ 154-155. Plaintiff alleges three similar prior incidents at the Jail involving Turn Key staff occurred that would put Sheriff Regalado on notice of the need for different or additional training of Turn Key medical staff. As discussed above with respect to Turn Key's liability, Plaintiff alleges that Dunniven Phelps and Dean Stith suffered negative medical outcomes at the Jail in 2019 and 2021, respectively, after Turn Key providers failed to escalate his serious symptoms to higher-level care. 2d Am. Compl. ¶¶ ¶¶ 107-115, 136-142. Plaintiff also alleges another incident involving Turn Key's failure to treat serious symptoms at the Jail that resulted in those inmates' deaths or other negative medical outcomes. *Id.* ¶¶ 105-106 (Caleb Lee). These three examples also suffice to plausibly allege deliberate indifference by Sheriff Regalado in retaining Turn Key as the Jail's medical provider. *See* 2d Am. Compl. ¶ 85 ("At least by the time of Mr. Williams' incarceration, the County/TCSO knew, or should have known, that Turn Key's grossly deficient system and 'plan' posed excessive risks to the health and safety of inmates, like Mr. Williams, who suffer from serious and complex medical conditions.").[10]

Sheriff Regalado argues that these three examples are insufficient to support municipal liability, because they are isolated and involve different medical issues. The Court rejects this argument. Even if the "widespread practice" and "deliberate indifference" analyses are limited to these three examples, they are sufficient to support an inference of Sheriff Regalado's deliberate indifference to Jail inmates' serious medical needs by retaining Turn Key as the Jail's medical provider.[11] *See Griego*, 100 F. Supp. 3d at 1213 (explaining that, to establish the existence of an

---

[10] Plaintiff's allegations concerning the alleged deficiencies in medical care provided at the Jail by other medical providers, prior to Turn Key's retention in December of 2016 (2d Am. Compl. ¶¶ 73-81), are not relevant to Turn Key's policies, customs, and practices at the Jail.

[11] Because the Court finds Plaintiff has plausibly alleged municipal liability against Sheriff Regalado based on knowledge of Turn Key's widespread practices leading to Nurse Rasor's

informal policy, custom, or practice, a plaintiff may plead "a pattern of multiple similar instances of misconduct," with "no set number" required to "render the alleged policy plausible"). Sheriff Regalado further argues that none of these examples has resulted in a liability finding against the Sheriff or Turn Key. However, as discussed above regarding Turn Key's motion, the Court is not persuaded that these active or settled cases should be excluded from consideration of whether a practice was widespread at the motion-to-dismiss stage, particularly where the plaintiff in a prior case had sufficiently alleged an underlying constitutional violation. *See* ECF No. 46 in *Phelps v. Turn Key*, 4:21-cv-365-GKF-JFJ (N.D. Okla. Aug. 31, 2026) (finding that Dunniven Phelps had "sufficiently alleged an underlying constitutional violation" for purposes of *Monell* claim against Sheriff Regalado).

Plaintiff's allegations are sufficient to withstand dismissal as to the deliberate indifference claim against Sheriff Regalado, in his official capacity. Sheriff Regalado's motion to dismiss the *Monell* claim is denied.

### C.    Punitive Damages

Sherif Regalado seeks dismissal of Plaintiff's request for punitive damages. It is well-established that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). However, a punitive damage claim "is not an independent cause of action and is not properly at issue in a Rule 12(b)(6) motion." *Crawford v. Turn Key Health Clinics, LLC*, No. 24-CV-6-JDR-SH, 2025 WL 1885637, at *7–8

---

actions, the Court does not address Plaintiff's alternative grounds for municipal liability, based on a Jail policy of violating the Oklahoma Jail Standards in failing to perform regular visual sight checks of detainees. *See* ECF No. 36 at 20-26. As explained above with regard to Turn Key, the Court does not find a constitutional violation sufficiently alleged based on a systemic failure to provide medical care at the Jail, nor does it find the alleged cost-sharing policy between TCSO and Turn Key to be sufficiently linked to Williams' injuries.

(N.D. Okla. July 8, 2025) (citing *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991).

Therefore, the Court denies Sheriff Regalado's request to dismiss the punitive damages claim.

## VI.    Conclusion

For the reasons detailed above, Defendant Megan Rasor, APRN's Motion to Dismiss (ECF No. 39) is **DENIED**.  Defendant Turn Key's Motion to Dismiss (ECF No. 29) is **DENIED**. Defendant Vic Regalado, in his official capacity as Sheriff of Tulsa County's Motion to Dismiss (ECF No. 28) is **DENIED**.

**SO ORDERED** this 11th day of August, 2026.


_____
**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**